# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

```
-------------------------------------------------------- x
In re:                                      :    Chapter 11
                                            :
BUCKINGHAM SRC, INC.,                        :    Case No. 13-17583
                                            :
                        Debtor.              :    Judge Jessica E. Price Smith
                                            :
-------------------------------------------------------- x
```

**EMERGENCY MOTION OF DEBTOR AND DEBTOR-IN-POSSESSION FOR INTERIM AND FINAL ORDERS AUTHORIZING DEBTOR TO: (A) OBTAIN SECURED SUPERPRIORITY POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3) AND 364(d)(1); (B) UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. §§ 105, 361, 362 AND 363; (C) GRANT ADEQUATE PROTECTION TO PRE-PETITION SECURED LENDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362 AND 363; AND (D) SCHEDULE FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b), 4001(c) AND 9014; AND (E) GRANTING RELATED RELIEF**

Buckingham SRC, Inc. ("SRC," "Debtor," or "Borrower"), the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Case"), by and through its undersigned proposed counsel, pursuant to Sections[1] 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1)and Rules 2002, 4001, and 9014, hereby moves (the "Motion") the United States Bankruptcy Court for the Northern District of Ohio (the "Court") for entry of an interim order in substantially the form attached hereto as Exhibit A (the "Order"):

1.  authorizing Debtor to obtain credit and incur debt pursuant to Sections 105, 361, 362, 363 and 364 and Rules 2002, 4001 and 9014 and in accordance with the Term Sheet and the DIP Financing Documents (each as defined below) between Debtor and Triangle Capital Corporation (together with its successors, assigns, and transferees, "Triangle" or "DIP Lender", upon the terms and subject to the conditions set forth herein;

---

[1] Unless otherwise indicated, all "Section" references are to 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") and all "Rule" references are to the Federal Rules of Bankruptcy Procedure (2013) (the "Bankruptcy Rules").

2.  granting first priority, valid, priming, perfected, and enforceable liens (as defined in Section 101(37)) and a Superpriority Claim[2] to the DIP Lender against all the Pre-Petition Collateral pledged as collateral under the Senior Pre-Petition Loan Documents (the "Post-Petition Collateral") comprised of substantially all the assets of Debtor pursuant to Sections 364(c)(2) and 364(d)(1), and with priority as to administrative expenses, as provided in Section 364(c)(1);

3.  authorizing Debtor pursuant to Sections 363(c) and 363(e), to use Cash Collateral under the Senior Pre-Petition Loan Documents and Junior Pre-Petition Loan Documents (as each term is defined below) and to provide adequate protection, pursuant to Section 361 to Pre-Petition Lender for the benefit of Pre-Petition Lender by granting superpriority administrative expense claims and valid, binding and enforceable liens in property of Debtor's estate, subject only to the Carve-Out and excluding Avoidance Actions, and (ii) by making adequate protection payments to Pre-Petition Lender in the amounts set forth in the Budget on the Senior Loans, as further described herein;

4.  authorizing Debtor to provide adequate protection to Pre-Petition Lender by permitting Pre-Petition Lender to accrue post-petition interest on the Junior Term Notes and include such accrual in the Pre-Petition Lender's pre-petition claim in respect of the Junior Term Notes;

5.  modifying the automatic stay imposed by Section 362 to permit DIP Lender and Pre-Petition Lender to take certain actions in respect of the DIP Facility (as defined herein) and to permit certain other actions, all as further described herein;

6.  scheduling the Final Hearing within thirty (30) days of the Petition Date; and

7.  entering the Final Order providing final authorization for the DIP Financing.

**A MEMORANDUM IN SUPPORT IS ATTACHED HERETO AND INCORPORATED BY REFERENCE HEREIN.**

---

[2] Unless otherwise defined herein, all capitalized terms shall have the same meaning as set forth in the Order or DIP Financing Documents, as applicable.

6004797.6

Dated: October 28, 2013                    Respectfully submitted by:

/s/ Christopher W. Peer
Nancy A. Valentine (0069503)
Christopher W. Peer (0076257)
Emily W. Ladky (0085527)
Hahn Loeser & Parks LLP
200 Public Square, Suite 2800
Cleveland, Ohio 44114
Telephone:    (216) 621-0150
Facsimile:    (216) 241-2824
E-Mail:       navalentine@hahnlaw.com
              cpeer@hahnlaw.com
              eladky@hahnlaw.com

*Proposed Counsel for Debtor and Debtor-in-Possession*

6004797.6

**MEMORANDUM IN SUPPORT**

## I.      PRELIMINARY STATEMENT

1.      In the chart that follows, Debtor sets forth a concise statement of the requested relief and a summary of the key terms of the proposed DIP Financing Documents (defined below) and the locations within the relevant documents of certain material provisions of the same.[3]

| Term and any Applicable Rule Reference(s) | Summary | Location of Term |
|---|---|---|
| Borrower | Buckingham SRC, Inc. | |
| DIP Lender | Triangle Capital Corporation, in its capacity as lender under the DIP Facility, and together with any other entities that may hereafter become a lender thereunder. | Order, ¶ (1), p. 2 |
| DIP Facility<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | To fund and pay, among other things, ongoing working capital needs of Debtor, a revolving facility of up to the principal amount of $2,000,000.00 prior to entry of the Final Order and up to an additional principal amount of $500,000.00 after entry of the Final Order through the Maturity Date, reflecting total borrowing under the revolving facility, subject to the Budget, and in accordance with the DIP Financing Documents and variance contained therein. | Order, ¶ 11, Ex. 1<br><br>DIP Loan Agreement, p.3 |
| Term/Maturity Date<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | The earliest to occur of (a) January 15, 2014; (b)(i) the consummation of a sale of substantially all of the Debtor's assets or business pursuant to Section 363, which is authorized by the Bankruptcy Court or (ii) confirmation by the Bankruptcy Court of a plan of reorganization for Debtor; (c) appointment of a Chapter 7 or Chapter 11 trustee; and (d) a Termination Date, except that such date may be extended from time to time by written agreement of Debtor and DIP | Order, ¶¶ 11, 15, Ex. 1, DIP Loan Agreement, p.3 |

---

[3]     In the event of an inconsistency between the summary of key terms and the applicable DIP Financing Documents, the applicable DIP Financing Documents shall govern. Unless otherwise indicated, capitalized terms used in this summary and throughout this Motion shall have the meanings ascribed to them in the Order or the DIP Financing Documents, as applicable.

6004797.6

| Term and any Applicable Rule Reference(s) | Summary | Location of Term |
|---|---|---|
| | Lender. | |
| Interest Rate<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | Non-Default Interest Rate: 8.00% per annum on the principal amount outstanding from time to time, calculated on an actual/360 basis, payable in arrears on the last day of each month and on the Maturity Date.<br><br>Default Interest Rate: Applicable rate plus two percent (2%) | Order, Ex. 1, DIP Loan Agreement, § 2.2(a) |
| Events of Default<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | Standard events of default and certain timing requirements shall constitute an "Event of Default" including default in the monthly interest payments, conversion to chapter 7, appointment of a chapter 11 trustee, dismissal of the Case, stay relief on any collateral, priming the DIP Lender, commencement of any foreclosure action, failure to file a motion to sell substantially all of Debtor's assets by October 31, 2013, approval of a sale of substantially all of Debtor's assets within sixty (60) days of the Petition Date. | Order, ¶ 18(c), 19, Ex. 1, DIP Loan Agreement, § 8 |
| Fees<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | Lender Expenses shall accrue and shall not be paid when due under the Budget; provided, that Lender reserves the right to demand payment upon the occurrence of an Event of Default | Order, ¶ 25, Ex. 1, DIP Loan Agreement, p. 5 and § 2.2(e) |
| Budget<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | A 12-week budget which shall reflect projected cash receipts, operating expenses, payroll expenses, capital expenses and cash balances, as may be amended, updated or supplemented with prior consent of the DIP Lender. | Order, ¶ 11 Ex. 1, DIP Loan Agreement, Ex. A |
| Carve-Out<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | The aggregate amount of any budgeted and unpaid fees, costs, and expenses that were accrued or incurred by the professionals retained by the Debtor, including counsel, financial advisors, accountants, and investment banker and any professionals retained by the Committee (collectively, the "Professionals") that are in accordance with the Budget and Professional Expense Cap plus the UST/Clerk Fees (collectively, the "Carve-Out"). | Order, ¶ 6 |
| Liens/Collateral/ Grant of Priority or a Lien on Estate | Pursuant to Section 364(c)(2), a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all presently | Order, ¶¶ 5 and 9, Ex. 1, DIP Loan |

6004797.6

| Term and any Applicable Rule Reference(s) | Summary | Location of Term |
|---|---|---|
| Property<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(i) | owned or hereafter acquired property and assets of the Debtor, of any kind or nature, whether real or personal, tangible or intangible, wherever located, now owned or hereafter acquired or arising, and all proceeds, products, rents and profits thereof, all cash, goods, accounts receivable, inventory, cash-in-advance deposits, real property, machinery, equipment, vehicles, trademarks, trade names, licenses, causes of action, rights to payment including tax refund claims, insurance proceeds, and tort claims, causes of action, claims for relief, and the proceeds, products, rents, and profits of all of the foregoing (but specifically excluding Avoidance Actions).<br><br>Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected first priority senior priming security interest in and lien upon all pre-petition and post-petition property of the Debtor, whether now existing or hereafter acquired, that is subject to the Pre-Petition Liens (including Adequate Protection Liens as defined herein and granted hereunder).<br><br>The Post-Petition Liens shall not be subject to, made *pari passu* with, or subordinated to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtor and its estate under section 551 of the Bankruptcy Code, (ii) any other lien or security interest pursuant to Section 364(c) or (d) or otherwise ("Permitted Priority Liens"), or (iii) any other liens arising after the Petition Date, including any liens or security interests granted in favor of any federal, state, municipal, or other governmental unit, commission, board, or court for any liability of the Debtor, excepting therefrom liens for real estate taxes. The DIP Liens are subject only to, and subordinate to, the Carve-Out.<br><br>The DIP Lender will be granted an allowed superpriority administrative claim (the "Superpriority Claim") in accordance with Section 364(c)(1), having a priority in right of payment over any and all other obligations, liabilities an indebtedness of the Debtor, including, but not limited to, the Senior Loans, which | Agreement, §§ 4 and 7.15 |

6004797.6

| Term and any Applicable Rule Reference(s) | Summary | Location of Term |
|---|---|---|
| | for avoidance of doubt are not entitled to treatment as an ordinary or superpriority administrative claim except to the extent of any Adequate Protection Claim, as defined below, for diminution in value or as adequate protection for priming by the DIP Facility, now in existence or hereafter incurred by Debtor and over any and all administrative expenses or priority claims of any kind including as specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 363, 364, 503(b), 506(c), 507(a), 507(b), 546, 726 (to the extent permitted by law), 1113 and 1114 or any other provision of the Bankruptcy Code, whether arising in this Case or in any superseding chapter 7 case concerning Debtor. The Superpriority Claim shall be payable from and have recourse to all pre-petition and post-petition property of Debtor and all proceeds thereof. | |
| Adequate Protection<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(ii) | Subject to certain exceptions, Pre-Petition Lender shall receive monthly payments, continued insurance and Adequate Protection Liens.<br><br>Pre-Petition Lender shall be granted (effective and perfected by operation of law and without the necessity of the execution by the Debtor of mortgages, security agreements, pledge agreements, financing statements, or other agreements to the fullest extent as otherwise provided herein respecting the Post-Petition Liens) replacement and additional security interests in and liens upon the Pre-Petition Collateral and DIP Collateral of the Debtor, excluding Avoidance Actions, and the proceeds thereof ("Adequate Protection Liens"), as adequate protection for any diminution in the value of its valid and perfected security interests and liens in the Pre-Petition Collateral as of the Petition Date. The Adequate Protection Liens shall be subject and subordinate only to (i) the DIP Liens, (ii) the Permitted Priority Liens, and (iii) the Carve-Out (each as defined and described herein) (collectively, the "Adequate Protection Obligations"):<br><br>If the Adequate Protection Liens are insufficient to provide adequate protection, then the Pre-Petition | Order, ¶ 12 |

6004797.6

| Term and any Applicable Rule Reference(s) | Summary | Location of Term |
|---|---|---|
| | Lender shall be granted (subject to the payment of the Carve-Out) a superpriority claim as provided for in Section 507(b) ("Section 507(b) Claim") in an amount equal to the aggregate diminution in value of its interest in the Pre-Petition Collateral resulting from the sale, lease, or use by the Debtor of Cash Collateral and any other Pre-Petition Collateral, the priming of the Pre-Petition Lender' security interests and liens in the Pre-Petition Collateral by DIP Lender pursuant to the DIP Financing Documents and this Order, the imposition of the automatic stay pursuant to Section 362, and any foreclosure or other disposition by the DIP Lender of the Pre-Petition Collateral. The priority of the Section 507(b) Claim shall be junior to the Superpriority Claim and the Carve-Out. For the avoidance of doubt, the Section 507(b) Claim may be asserted against the proceeds of Avoidance Actions. | |
| Determination as to Pre-Petition Liens and Claims<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(iii) | Debtor further stipulates and agrees that the Senior Loans and Junior Term Notes are secured by valid, enforceable, duly perfected liens and security interests granted by Debtor to Triangle on the Pre-Petition Collateral. For avoidance of doubt, the Pre-Petition Collateral includes all of Debtor's tangible and intangible real, personal and mixed assets and all other kind of property and assets whatsoever in accordance with the terms and provisions of the Senior Pre-Petition Loan Documents and Junior Pre-Petition Loan Documents.<br><br>Debtor further stipulates and agrees that the Senior Loans and Junior Term Notes are not avoidable nor subject to reduction, disallowance or subordination of any kind. | Order, ¶¶ D, 25 |
| Waiver or Modification of Automatic Stay<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(iv) | Subject to certain notice requirements following an Event of Default, a modification of the automatic stay only to the extent necessary to effectuate the DIP Financing. | Order, ¶ 14 |

8

| Term and any Applicable Rule Reference(s) | Summary | Location of Term |
|---|---|---|
| Waiver or Modification of Right to File Plan, Seek Use of Cash Collateral, or Obtain Financing<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(v) | Subject to certain exceptions, there may be no liens or claims senior or *pari passu* with those granted to the DIP Lender and cannot incur additional indebtedness beyond DIP Facility.. | Order, ¶ 5, Ex. 1, DIP Loan Agreement, § 7.4 |
| Establishment of Deadline for Filing Plan of Reorganization and Related Matters or for Filing Sale Motion<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(vi) | Debtor to file a motion to sell substantially all of Debtor's assets acceptable to DIP Lender and Pre-Petition Lender in their sole discretion on or before October 31, 2013; Debtor to obtain Bankruptcy Court approval of a sale of substantially all of Debtor's assets sixty (60) days after the Petition Date. | Order, ¶¶ 11, 19, Ex. 1, DIP Loan Agreement, § 6.9 |
| Waiver or Modification of Non-Bankruptcy Law Pertaining to Lien Perfection, Foreclosure, or Enforcement<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(vii) | All Post-Petition Liens and Adequate Protection Liens granted for the benefit of the DIP Lender and/or Triangle shall be valid, enforceable and deemed perfected, effective upon entry of the Order, and no further action shall be required to effect such perfection. | Order, ¶ 17 |
| Release, Waiver, or Limitation on Claims or Other Causes of Action Belonging to Estate or Trustee<br><br>Fed. R. Bank. P. 4001(c)(1)(B)(viii) | Debtor provides complete release of Pre-Petition Secured Party Releasees. | Order, ¶¶ D, 8, and 25 |
| Indemnification Provisions<br><br>Fed. R. Bank. P. 4001(c)(1)(B)(ix) | Debtor shall (a) pay or reimburse DIP Lenders on demand for all Lender Expenses incurred, including in connection with an Event of Default, underlined provided that Lender Expenses shall accrue and not be paid during the period covered by the Budget; underlined provided, underlined however, | Order, ¶ 26, Ex. 1, DIP Loan Agreement, § 12.2 |

9

| Term and any Applicable Rule Reference(s) | Summary | Location of Term |
|---|---|---|
| | that DIP Lenders may demand payment or reimbursement of Lender Expenses upon the occurrence and during the continuation of an Event of Default; (b) pay, indemnify and hold DIP Lenders harmless from any and all recording and filing fees and any and all liabilities with respect to or resulting from any delay in paying stamp, excise and other similar taxes (other than withholding taxes), if any, which may be payable or determined to be payable in connection with the execution and delivery of, or consummation of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, any DIP Loan Document and any such other documents; and (c) indemnify and hold harmless DIP Lenders and its shareholders, directors, agents, officers, subsidiaries and affiliates, successors and assigns, and professional advisors from and against any and all claims, actions, causes of action, and suits, whether groundless or otherwise, and from and against any and all liabilities, losses, damages, settlement payments, obligations, and reasonable costs and expenses of every nature and character arising out of the DIP Loan Documents or the transactions contemplated thereby and by the Interim DIP Order or the Final DIP Order, except to the extent that such liabilities, losses, damages, or expenses arise out of such person's gross negligence or willful misconduct as finally determined by a final non-appealable order of a court of competent jurisdiction. The indemnity includes indemnification for the Lender's exercise of discretionary rights granted under the DIP Loan Documents.  In all such litigation, or the preparation therefor, Lender shall be entitled to select its own counsel and, in addition to the foregoing indemnity, Debtor agrees to pay promptly the reasonable fees and expenses of such counsel. | |
| Waiver of Claims Under Bankruptcy Code Section 506(c)<br><br>Fed. R. Bank. P. | Grant of Superpriority under Section 507(b) includes a waiver of claims against the DIP Lender arising under Section 506(c) in Final Order. | Order, ¶¶ L, 10, Ex. 1, DIP Loan Agreement, § 7.18 |

6004797.6

| Term and any Applicable Rule Reference(s) | Summary | Location of Term |
|---|---|---|
| 4001(c)(1)(B)(x) | | |
| Granting of Liens on Claims and Causes of Action Arising Under Bankruptcy Code<br><br>Fed. R. Bank. P. 4001(c)(1)(B)(x) | Not applicable. | N/A |

## II.    JURISDICTION, VENUE, AND BASIS FOR RELIEF

2.      This Court has jurisdiction of this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

3.      Venue of this case in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4.      The predicates for the relief sought herein include, without limitation, Sections 105, 361, 362, 363, and 364 and Rules 2002, 4001(b) and (c), and 9014.

## III.    BACKGROUND

5.      On the date hereof (the "Petition Date"), Debtor commenced the Case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

6.      Debtor is continuing in possession of its properties and assets and is operating and managing its business as debtor-in-possession pursuant to Sections 1107 and 1108. No trustee, examiner, or official committee of unsecured creditors has been appointed in the Case.

### *Debtor and Debtor's Business*

7.      SRC's business produces both fused and blended magnesium flux for use in industrial and other applications. SRC's fused fluxes are developed through processes that produce premium fluxes for control and refining of molten metal, primarily magnesium. SRC also produces low moisture anhydrous magnesium chloride which is used by other of Debtor's

6004797.6

customers in the plastics industry. SRC's fused fluxes are especially low in moisture, promoting safety and overall product quality, and offer higher value due to homogeneous chemistry and quality materials. SRC's blended fluxes provide added scope for the chemistry often required by customers but unavailable in a fused flux.

8. SRC is a leading producer of magnesium flux and has operated and produced magnesium flux for more than 35 years. SRC is one of the only producers of magnesium flux in the world and to SRC's knowledge the primary (if not only) source for flux located in the United States. SRC's customers bridge many industries, including, but not limited to, aerospace and defense, agriculture, automotive, building and construction, consumer products, food and beverage, packaging and plastics.

9. SRC employs 17 workers collectively at its Cleveland, Ohio and Albany, Oregon locations. These employees work to produce flux to customer specifications across the United States and around the world. SRC has built a reputation of success and quality in this specialized manufacturing process. SRC's competitive advantages flow from its experience and craft with this highly technical chemistry and the applications that can and do result from such use.

10. As a result of its reputation and relationships, and the unique nature of the products SRC produces, SRC continues to have constant demand for SRC's products from its customers despite the need to commence this Case. In fact, the restructuring expected from this Case is anticipated to allow SRC to better meet this demand and restore profitability because SRC will receive funding to complete critical repairs and replacement of SRC's capital assets, including critical equipment, and restructure its capital structure.

***Debtor SRC***

11. Debtor SRC is a Delaware corporation headquartered in Cleveland, Ohio. Its mailing address is 3425 Service Road, Cleveland, Ohio. SRC is approximately 95% owned by

6004797.6

SRC Equity, LLC ("SRC Equity") and the remainder is owned by related investors and SRC management. As discussed below, SRC Equity is a non-debtor obligor of the Senior Pre-Petition Obligations and unconditional guaranty of the Junior Pre-Petition Obligations under the Loan Documents; but SRC Equity is not obligated, in any way, under the Sellers Notes.[4]

### Events Leading to the Chapter 11 Filing

12.     To complete production of products at the levels and volumes required by its customers, SRC owns and operates significant heavy machinery. This machinery includes (i) a scrubber system; (ii) a furnace; (iii) a mixer (with blending operations); (iv) cooling and packing equipment; and (v) other equipment (collectively, the "Heavy Machinery"). The Heavy Machinery at SRC's Cleveland, Ohio location (the "Cleveland Heavy Machinery") is aged and in dire need of repair, and in some cases replacement.

13.     In May 2013 electrical failures befell SRC in Cleveland, which resulted in a significant decrease in the operations and output of the Cleveland Heavy Machinery. The decrease in output resulted in a direct reduction in sales, despite continued demand. The economic result of the decrease in productivity and sales has been devastating. The year over year (through August 31 of 2012 and 2013) change in operating profit showed a decrease in profit of almost $450,000.00 (from $576,000.00 at 8/31/12 to $132,000.00 at 8/31/13). This change in financial stability has made it impossible for SRC to meet its financial obligations as they came due, and forced SRC to fall chronically behind on payments to lenders and trade vendors. The decrease in sales negatively impacts SRC's working capital availability and cash flow and its ability to meet the demands of its customers.

---

[4] SRC Equity is entering into certain forbearance agreements in respect of the Senior Term Loans with DIP Lender and in respect of the Junior Term Notes with DIP Lender as a condition to Debtor obtaining the DIP Facility.

6004797.6

14. Moreover, the impairment of the Cleveland Heavy Machinery has led to safety and environmental concerns and inquiries from the Cleveland Department of Health, Division of Air Quality, the Cleveland Fire Department and the Ohio Environmental Protection Agency. SRC is diligently responding to these inquiries in order to help ensure a safe and appropriate workplace. To date, concerns relating to reporting procedures have been the primary investigation.

15. The repair and replacement of the Cleveland Heavy Machinery is essential to maintain operations, meet customer demand and, in part, resolve concerns of the various regulatory agencies. SRC estimates that approximately $1 million in repairs and replacement machinery are required to fix the Cleveland Heavy Machinery and return the Debtor to profitability. Without the DIP Facility, SRC cannot make the necessary repairs.

16. As of October 27, 2013, SRC reported on its financial statements current "hard" assets of approximately $2,996,000.00 with cash of $43,968.00. Also, as of the Petition Date, Debtor's financial statements report trade payables of approximately $718,316.00, which include substantial amounts owed to SRC's sole and critical United States supplier of the raw material to make magnesium fluxes.

17. ***Need for Post-petition Financing.*** Debtor's senior pre-petition secured lender, which also is the proposed DIP Lender, agreed to provide financing to Debtor through Debtor-in-Possession financing to allow SRC to fix and replace certain Cleveland Heavy Machinery and maintain operations during repairs and this Case. Debtor's cash and repair needs are critical. With the current state of the Cleveland Heavy Machinery, SRC has been and presently is unable to meet the demands of its customers. As a result, Debtor is and has been forced to provide customers with only a portion of their orders for several months and Debtor is or will be unable

6004797.6

to make payment of the various secured obligations it is required to meet. Further, each month without repair and/or replacement of the Cleveland Heavy Machinery will result in Debtor's perpetual failure to meet customer demand, a further and continuous decline in Debtor's profitability, and ultimately liquidation of Debtor. With overflowing orders in hand, and the financing provided by Triangle to commence proper repair and replacement of the Cleveland Heavy Machinery, Debtor can get back on its feet and to appropriate production levels to generate positive cash flow and become a healthy and profitable business.[5]

18.     ***DIP Financing***. Debtor seeks to enter into an agreement (subject to Court approval) to obtain Debtor-in-Possession financing ("DIP Financing") from the DIP Lender. The DIP financing agreement (the "DIP Loan Agreement") (attached to Exhibit A, proposed Order as Exhibit 1) and related documents and proposed order collectively referred to herein as the "DIP Financing Documents".[6]

## IV.     SUMMARY OF PRE-PETITION INDEBTEDNESS AND CAPITAL STRUCTURE

### *Senior Pre-Petition Lender*

19.     As of the Petition Date, Debtor and SRC Equity were parties to that certain Loan and Security Agreement dated May 31, 2012 (the "Pre-Petition Credit Agreement") with Triangle Capital Corporation, assignee of Bridge Bank, National Association (the "Pre-Petition Lender"). Pursuant to the Pre-Petition Credit Agreement, the Pre-Petition Lender provided Debtor with (i) a revolving line of credit not to exceed $500,000.00 (the "Revolving Line of

---

[5] The Pre-Petition Lender will not and cannot advance additional funds outside of chapter 11 because, among other significant reasons, the Senior Pre-Petition Loan Documents, Junior Pre-Petition Loan Documents and related subordination document provided by the Sellers prevent further advances.

[6] In order to limit the costs of duplication and postage in connection with filing and serving this Motion, the DIP Loan Agreement is attached only to the ECF filing. The document also is available upon request from Debtor's counsel.

6004797.6

Credit"); and (ii) a Term Loan (the "<u>Senior Term Loan</u>" and together with the Revolving Line of Credit, the "<u>Senior Loans</u>") in the amount of $3,000,000.00. As of October 23, 2013, the outstanding unpaid balance on the Revolving Line of Credit was not less than $376,903.64 and, as of October 23, 2013, the outstanding unpaid balance on the Senior Term Loan was not less than $1,911,914.58 (collectively, the "<u>Senior Pre-Petition Obligations</u>").

20.     Pursuant to the Pre-Petition Credit Agreement, and those certain Intellectual Property Security Agreements each dated May 31, 2012 (the "<u>Pre-Petition IP Security Agreements</u>"), Debtor and non-debtor SRC Equity granted to the Pre-Petition Lender, continuing liens and security interests in and to all presently existing and hereafter acquired or arising Collateral (as defined in the Pre-Petition Credit Agreemen)t and the Intellectual Property Collateral (as defined in the Pre-Petition IP Security Agreements) to secure prompt repayment of any and all Obligations (as defined in the Pre-Petition Credit Agreement) and performance of their covenants and duties under the Pre-Petition Credit Agreement and other loan documents. In addition, pursuant to that certain Open-End Mortgage, Assignment of Rents, Security Agreement and Fixture Filing, dated March 20, 2013 (the "<u>Senior Ohio Mortgage</u>") and certain Line of Credit Instrument Deed of Trust, Security Agreement, Assignment of Leases, Rents and Profits, Financing Statement and Fixture Filing, dated as of April 4, 2013 (the "<u>Senior Oregon Mortgage</u>" and together with the Senior Ohio Mortgage, the "<u>Senior Pre-Petition Mortgages</u>"), Debtor granted to the Pre-Petition Lender mortgage liens and security interests in and to all of Debtor's real property, fixtures, and improvements and specifically, in and to that certain real property located at 3425 Service Road, Cleveland, Cuyahoga County, Ohio 44111(the "<u>Ohio Property</u>"), as more specifically described in the Senior Ohio Mortgage, and, in and to that certain real property located at 2920 Arnold Road NE, Albany, Linn County, Oregon 97321, as

more specifically described in the Senior Oregon Mortgage (the "Oregon Property" and together with the Ohio Property, the "Mortgage Property" and together with the Collateral and the Intellectual Property Collateral, the "Pre-Petition Collateral"), as more specifically described in the Senior Ohio Mortgage. The Senior Loans and Senior Pre-Petition Obligations are secured by all the assets of Debtor except for Permitted Liens, as described and defined in the Pre-Petition Credit Agreement. The Senior Pre-Petition Mortgages secure the performance of the covenants and agreements contained in the Senior Pre-Petition Mortgages, the Pre-Petition Credit Agreement and any other Loan Documents (as defined in the Pre-Petition Credit Agreement) and secures the payment when due of (i) the obligations of the Debtor under the Pre-Petition Credit Agreement, together with any applicable interest, (ii) other Obligations as defined in the Pre-Petition Credit Agreement, (iii) all amounts expended or advanced by the Pre-Petition Lender pursuant to any Loan Document; and (iv) all unpaid advances made by Pre-Petition Lender, with respect to the Mortgage Property, for payment of taxes, assessments, insurance premiums and all other liabilities and indebtedness owing by Debtor to the Pre-Petition Lender.

21.     The liens, security interests, stock pledges, and/or mortgages granted by the Debtor to the Pre-Petition Lender prior to the Petition Date, including, without limitation the liens, security interests and mortgages granted in the Pre-Petition Credit Agreement, the Pre-Petition IP Security Agreements and the Senior Pre-Petition Mortgages, are referred to herein as the "Pre-Petition Liens".

22.     As described below, the obligations owed to Pre-Petition Lender, both as assignee of Triangle Mezzanine Fund, LLLP, ("Triangle Mezzanine") and original lender, have been subordinated in and to the Pre-Petition Collateral of Debtor to the Senior Pre-Petition Obligations pursuant to that certain Subordination and Intercreditor Agreement dated May 31,

13-17583-jps    Doc 9    FILED 10/28/13    ENTERED 10/28/13 22:10:49    Page 17 of 32

2012 and Subordination Agreements each dated April 4, 2013 (collectively "Triangle-SRC Subordinations").  Similarly, the Sellers (as defined below), have subordinated their interests, if any, in and to the Pre-Petition Collateral to the Pre-Petition Lender pursuant to that certain Subordination and Intercreditor Agreement dated May 31, 2012 (the "Seller-SRC Subordination" and together with the Pre-Petition Credit Agreement, Pre-Petition IP Security Agreements, Senior Mortgages, Triangle-SRC Subordinations and the SRC Equity Subordination and other related loan documents, the "Senior Pre-Petition Loan Documents").

*Mezzanine Debt*

23.     On or about December 30, 2010, SRC purchased the magnesium flux business and its assets from Rossborough Supply Company and Magnesium Aluminum Corporation (collectively, the "Sellers") through financing provided by the Pre-Petition Lender.

24.     On December 30, 2010, pursuant to that certain Senior Subordinated Note Purchase Agreement (the "Note Purchase Agreement"), Triangle purchased that certain Senior Subordinated Note (the "Triangle Note") in the original principal amount of $3,000,000.00 and Triangle Mezzanine purchased that certain Senior Subordinated Note (the "Triangle Mezzanine Note" and together with the Triangle Note, the "Junior Term Notes" and together with the Note Purchase Agreement, the Sellers Subordination (as defined below) and all other related loan and collateral documents, the "Junior Pre-Petition Loan Documents") in the original principal amount of $6,000,000.00 each maturing on December 30, 2014.  As of October 23, 2013, the outstanding unpaid balance on the Junior Term Notes is $6,169,372.93 plus accrued and unpaid interest on the outstanding principal balance at fourteen (14%) per annum, default interest of an additional 2%, and other costs and expenses as provided in the Note Purchase Agreement and Junior Term Notes (the "Junior Pre-Petion Obligations").  Triangle Mezzanine assigned all right, title, and interest in and to the Triangle Mezzanine Note to Pre-Petition Lender.

6004797.6

25.     Pursuant to the Note Purchase Agreement, Triangle-SRC Subordinations and that certain Subordination and Intercreditor Agreement among Sellers, Triangle, Triangle Mezzanine and Debtor dated December 30, 2010 (the "Sellers Subordination"), among other documents, the Junior Pre-Petition Obligations are secured by *pari passu* second priority mortgage liens and security interests in and to the Pre-Petition Collateral.  The Pre-Petition Lender has consented to the DIP Financing Motion to the use of Cash Collateral (as defined below) in accordance with the terms and conditions set forth in the DIP Financing Documents and the Debtor borrowing funds and using cash collateral as proposed in the Order.

*Sellers Debt*

26.     Pursuant to that certain Asset Purchase Agreement (as amended from time to time) dated December 30, 2010 (the "Pre-Petition APA") by and among SRC and the Sellers, the Amended and Restated Sellers Note and Second Amended and Restated Basell Seller Note each dated May 31, 2012 (the "Sellers Notes")[7] executed in favor of the Sellers by SRC and related loan and transaction documents, as of October 27, 2013, Debtor allegedly owes to Sellers not less than $2,138,042.00 under the Sellers Notes, Pre-Petition APA, and related documents.  At best, the Sellers Notes are secured by a third priority security interest in and to the Collateral and Intellectual Property Collateral of Debtor only.  The Sellers have no lien or security interest in the Mortgage Property.

27.     Pursuant to Section 4.3(c) of the Seller-SRC Subordination, the Sellers have agreed to DIP Lender's decisions regarding SRC's continued use of cash collateral in this Case and the post-petition financing contemplated herein.  Section 4.3(c) provides in pertinent part,

---

[7] The original Sellers Notes, each dated December 31, 2010 executed in connection with the Pre-Petition Asset Purchase Agreement have been amended and restated, in part, reducing the principal balance due.

6004797.6

Without limiting the generality of the foregoing, each [Seller] agrees that, if an Insolvency or Liquidation Proceeding occurs: (i) the [Pre-Petition Lender] may consent to the use of cash collateral on such terms and conditions and in such amounts as it shall in good faith determine without seeking or obtaining the consent of such [Seller] as holder of an interest in the Collateral; (ii) the [Pre-Petition Lender] may provide post-petition financing for any [Debtor] pursuant to Section 364 of the Bankruptcy Code or other applicable law and on such terms and conditions and in such amounts as they shall in good faith determine without seeking or obtaining the consent of the [Sellers] as holder of an interest in the Collateral, and the [Sellers] shall not oppose any such financing; (iii) if use of cash collateral by the [Debtor] is consented to by the [Pre-Petition Lender], the [Sellers] shall not oppose such use of cash collateral;

*See also* Triangle-SRC Subordinations, § 4.3(c). As a result, the Sellers have explicitly consented to the DIP Facility and the terms and conditions under which the DIP Lender proposes to lend funds to and allow the use of Cash Collateral by SRC.

## V.  REQUEST FOR AUTHORITY TO USE CASH COLLATERAL AND TO INCUR SECURED POST-PETITION FINANCING

28.    Debtor determined, in the exercise of its sound business judgment, that (a) it requires a post-petition credit facility to meet its ongoing working capital and general business needs, including commencing repairs of the Cleveland Heavy Machinery; (b) the terms of the DIP Facility will reasonably address the Debtor's financing requirements and constitute the best alternative under the circumstances; and (c) SRC requires the interim use of Cash Collateral for thirty (30) days through November 28, 2013, to pay, among other things, past-due and ongoing payroll, utilities, taxes, insurance, vendors, and other ordinary business costs and expenses and commence Cleveland Heavy Machinery repairs. Accordingly, subject to the Court's approval, Debtor has requested that: (i) the Pre-Petition Lender make available to Debtor, all of Debtor's cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents, whether original collateral or proceeds, products, rents or profits of other Pre-Petition Collateral or the proceeds thereof (collectively, the "Cash Collateral") and (ii) the DIP Lender to provide the post-petition financing pursuant to the terms and conditions of (a) the

6004797.6

proposed Order attached hereto as <u>Exhibit A</u> and any Final Order (as defined herein), (b) the DIP

Loan Agreement (as defined herein) and any ancillary documents referred to in the Order, the

DIP Financing Documents, or any final order required to be executed by the Debtor in

connection therewith, and (c) the Budget (as defined below) (collectively with the DIP Financing

Documents, the "<u>DIP Facility</u>").

## VI.   <u>NO CREDIT AVAILABLE ON MORE FAVORABLE TERMS</u>

29.     Before deciding to enter into the Term Sheet and the DIP Financing Documents,

Debtor and the DIP Lender engaged in arms' length, good faith negotiations, each with separate

and independent counsel experienced in matters of finance and bankruptcy law.  Accordingly,

any credit extended by the DIP Lender on or after the Petition Date pursuant to the terms of the

DIP Financing Documents and an order of this Court approving the DIP Facility should be

afforded the benefits of Section 364(e).

30.     Debtor determined, in the exercise of its reasonable business judgment, that the

financing to be provided by the DIP Lender is the only funding available to Debtor under the

circumstances and addresses Debtor's immediate necessary financing needs during its chapter 11

efforts.  Prior to agreeing to seek approval of the DIP Facility, Debtor contacted no less than

three alternative lenders (including Fifth Third Bank, PNC Bank, and Huntington National

Bank), none of which would agree to extend financing on more favorable terms.  The financing

available under the DIP Facility will enable Debtor, among other things, to avoid the cessation of

operations, maintain the continuity of operations, repair and replace critical equipment to meet

customer demand and reorganize and maximize the going concern value of its business and

related properties.

6004797.6

## VII.   BUDGET

31.   Debtor attaches a DIP and cash collateral budget ("Budget") as Exhibit 2 to the proposed Order.   Debtor represent that the Budget is achievable and will allow Debtor to continue to operate its business and meet its goals in this Case. The DIP Lender is relying upon Debtor's compliance with the Budget and the Order in agreeing to the Commitment and the DIP Financing Documents and the post-petition financing arrangements therein as well as consenting to use of Cash Collateral.

## VIII.   APPROVAL OF THE DIP FACILITY IS WARRANTED UNDER THE CIRCUMSTANCES AND APPLICABLE LAW

32.   Rule 4001(b) permits a court to approve a debtor's request for authorization to use cash collateral during the 15-day period following the filing of a motion requesting such authorization.   Similarly, Rule 4001(c) permits a court to approve a debtor's request for financing during the 15-day period following the request.   Under each of these provisions, a court may permit the cash collateral use or interim borrowing "only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Rule 4001(c)(2).   In examining requests for interim relief under Rule 4001, courts apply the same business judgment standard applicable to other business decisions.   *See, e.g., In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985). *See also In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990.

33.   As described above and below, Debtor's immediate need to use Cash Collateral and obtain the DIP Facility is critical and the only option for preventing harm to its estate and creditors and its customers that rely on SRC's product as their sole source.

### A.   Approval Pursuant to 11 U.S.C. § 364(c)

34.   Pursuant to Section 364(c), a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is

6004797.6

in the best interests of the estate. *Simasko*, 47 B.R. at 448-49 (authorizing interim financing agreement where debtor' best business judgment indicated financing was necessary and reasonable for benefit of estate); *Ames*, 115 B.R. at 38 (citations omitted) (with respect to post-petition credit, courts "permit debtor-in-possession to exercise their basic business judgment consistent with their fiduciary duties"); *see also* Collier on Bankruptcy, ¶ 364.05 (15th ed. rev.). Section 364(c) provides in pertinent part:

> (c)      If the trustee [or debtor in possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt -
>
> (1)      with priority over any and all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2)      secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3)      secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

35.      In satisfying the standards of Section 364(c), a debtor need not seek credit from every available source but should make a reasonable effort to seek other sources of credit available of the type set forth in Sections 364(a) and (b). *See In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (trustee demonstrated good faith effort that credit was not available without senior lien by unsuccessfully contacting other financial institutions in immediate geographic area; "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); *see also Ames*, 115 B.R. at 40 (debtor demonstrated the unavailability of unsecured financing where debtor approached several lending institutions); *In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992) (stating that debtor does not need to contact "infinite number" of lenders in order to demonstrate

6004797.6

unavailability of unsecured financing); *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where there are few lenders likely to be able and/or willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing"), *aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

36.    Courts have articulated a three-part test to determine whether a debtor-in-possession is entitled to financing under Section 364(c): (i) whether the debtor is unable to obtain unsecured credit under Section 364(b), *i.e.*, by allowing a lender only an administrative claim; (ii) whether the credit transaction is necessary to preserve the assets of the estate; and (iii) whether the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.  *See, e.g., In re Farmland Indus., Inc.*, 294 B.R. 855, 879 - 881 (Bankr. W.D. Mo. 2003); *In re Aqua Assocs.,* 123 B.R. 192, 195-96 (Bankr. E.D. Pa, 1991); *Ames*, 115 B.R.  at 37-40; *In re Crouse Group, Inc.*, 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987).

37.    Debtor is unable to obtain credit that is not both secured and entitled to superpriority administrative claim status from any other financing source and, in fact, has been unable to obtain credit on even a secured and superpriority administrative basis from any source other than the DIP Lender.  As stated, the Pre-Petition Lender is secured by substantially all of Debtor's assets with first and second priority mortgage liens and security interests and the Sellers have yet another lien in some of Debtor's personal property assets.  Under these circumstances, and given Debtor's current financial circumstances, Debtor has been unable to locate any third party lender to provide financing to Debtor.  Debtor had no choice but to negotiate with its only

6004797.6

financing option, the DIP Lender. The DIP Facility is Debtor's only available option. Debtor has shown that credit is not available without the protections of Section 364(c).

**B.    The Financing Is Fair And Reasonable**

38.    The terms of the DIP Facility and Order are fair, just, and reasonable under the circumstances, as ordinary and appropriate for secured financing to debtor-in-possession; reflect Debtor's exercise of its prudent business judgment consistent with its fiduciary duties; and are supported by reasonably equivalent value and fair consideration. The terms and conditions of the DIP Facility and the Order have been negotiated in good faith and at arms' length by and between Debtor and the DIP Lender, with both parties represented by counsel. Accordingly, Debtor believes that any credit extended under the terms of the DIP Facility and the Order is extended in good faith by the DIP Lender as that term is used in Section 364(e).

39.    Accordingly, after appropriate investigation and analysis, Debtor concluded that the DIP Facility is the best alternative available under the circumstances. Such conclusion is well within Debtor' business judgment, to which courts routinely defer. *See, e.g., In re Lifeguard Indus., Inc.*, 37 B.R. 3, 18 (Bankr. S.D. Ohio 1983) ("More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control in [sic] case impartially."); *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

40.    Debtor exercised sound business judgment by seeking advice from its legal and financial advisors in making the determination that the DIP Facility is fair and reasonable and in the best interest of Debtor's estate. Accordingly, Debtor should be granted authority under Section 364(c) to enter into the DIP Facility and borrow funds from the DIP Lender on the basis described herein and in the DIP Facility, on a senior secured super-priority basis.

6004797.6

### C.    Approval Pursuant to 11 U.S.C. § 364(d)

41.    Section 364(d) provides:

(d)    The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if-

(1)    the trustee [or debtor-in-possession] is unable to obtain such credit otherwise; and

(2)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).

42.    Hence, absent consent, in order to obtain what is commonly referred to as a "priming lien," Debtor must establish that (i) there was no other alternative to the DIP Facility, and (ii) the interests of the senior lien holders being "primed" will be adequately protected in the face of the proposed loan.  *In re First South Sav. Ass'n.*, 820 F.2d 700 (5th Cir. 1987); *In re W&W Protection Agency, Inc.*, 200 B.R. 615, 623 (Bankr. S.D. Ohio 1996).  *In re Levitt & Sons, LLC*, 384 B.R. 630, 640-41 (Bankr. S.D. Fla. 2008).

43.    Debtor meet the first criteria: there are no alternate funding sources.

44.    Debtor need not meet the second criteria because all lienholders being primed have consented.

45.    The Pre-Petition Lender, in each of their capacities as first and second priority lender have agreed to provide the DIP Facility and consented to and support this Motion and the proposed Order.

46.    Further, the Sellers have consented to this Motion and the DIP Facility and their terms and conditions pursuant to that certain Seller-SRC Subordination and the specific language of Section 4.3(c) of the Seller-SRC Subordination as set forth above.

6004797.6

47.     Even if the Court finds that the Sellers have not consented, the Sellers do not have an interest in the Mortgage Property and, therefore, are not entitled to adequate protection. Further, and based upon the current value of personal property that may be covered by the Sellers security interests (exclusive of any equipment constituting fixtures) is likely $0 because of the first and second priority liens and security intersts of the Pre-Petition Lender. As such, there is no interest to adequately protect. If anything the DIP Facility will increase the value of the personal property once repairs are completed in essence enhancing and preserving the value of estate property that secures the pre-existing security interests. *See, e.g., In re First South Sav. Ass'n.*, 820 F.2d 700; *In re Sky Valley, Inc.*, 100 B.R. 107.

48.     Accordingly, Debtor can establish that its "secured" lenders are adequately protected.

## IX.    <u>ADEQUATE PROTECTION</u>

49.     The secured lenders whose liens are being "primed" by new post-petition lender under Section 364(d) must be provided with adequate protection of their interests in collateral. *See In re Swedeland Dev. Group, Inc.,* 16 F.3d 552, 564 (3rd Cir. 1994 en banc) (noting that adequate protection is required under Section 364(d)(1)(B) to ensure that the creditor receives the value for which it bargained pre-bankruptcy); *Dunes Casino*, 69 B.R. at 793 (holding that "[a]dequate protection is designed to preserve the secured creditor's position at the time of the bankruptcy").

50.     As outlined above, no other post-petition credit is available to Debtor, in light of Debtor's financial circumstances and the blanket liens on substantially all of its assets that exist in favor of Triangle, as a pre-petition secured lender.

51.     Significantly, Triangle is the pre-petition secured lender being primed by the DIP Facility. Nevertheless, Triangle consents to the DIP Facility, subject to the adequate protection

6004797.6

being given to it.  With respect to the Mortgage Property, no other liens held by any other party

are being primed under the DIP Facility.  Finally, the Sellers have consented to the priming of

their lien interest in certain personal property of SRC pursuant to the Seller-SRC Subordination.

No liens held by any other party are being primed under the DIP Facility.

52.     Adequate protection of Triangle as a pre-petition lender will be demonstrated in at

least the following ways:

> (A)     Triangle as a prepetition secured lender, will be granted the Adequate
> Protection Liens to compensate it for the priming of its lien position and
> the use of its cash collateral and the use, sale or lease of other collateral.
> The Adequate Protection Liens ensure that Triangle will retain the full
> benefit of a subordinated lien on all available collateral.  *See In re*
> *Delaware & Hudson Ry. Co.,* 124 B.R. 169, 177-78 (Dist. Del. 1991)
> (priming lien under section 364(d) of the Bankruptcy Code may serve as
> adequate protection where, absent financing, value of collateral may be
> impaired); *In re JKJ Chevrolet, Inc.*, 190 B.R. 542, 548 (Bankr. E. D. Va.
> 1995) (rejecting creditor's adequate protection challenge where it was
> granted replacement liens by the Debtor); *In re Craddock-Terry Shoe*
> *Corp.*, 98 B.R. 250, 256 (Bankr. W. D. Va. 1988) (holding that
> replacement liens provided adequate protection sufficient to deny motion
> to lift automatic stay).
>
> (B)     Pre-Petition Lender will receive a Superpriority Claim, as more fully
> described above; and
>
> (C)     Pre-Petition Lender will receive adequate protection payments in the form
> of post-petition interest accruing on the Revolving Credit Line at the
> Prime Rate plus 7.00% and on the Senior Term Loan at the Prime Rate
> plus 6.00%, which includes 5.00% in each case as default interest, as set
> forth in the Budget.

53.     Under these facts, the Pre-Petition Lender's best hope of preserving the value of

their respective, prepetition liens and prepetition security interests is for Debtor to obtain

approval of the DIP Facility and thereby maintain the value of its business as a going concern

and repair and replace the Cleveland Heavy Machinery.  Once the DIP Facility is in place, the

value of Debtor's business will be better supported, and the value of the Pre-Petition Lender's

Pre-Petition Liens, even after they are subordinated to those set forth in the DIP Facility, will be

more likely preserved.  For this reason alone, implementation of the DIP Facility will adequately protect the Pre-Petition Lender and the Sellers as a prepetition secured lenders.  *See In re Stein*, 19 B.R. 458, 460 (Bankr. E. D. Pa. 1982) (an existing secured creditor was adequately protected where "[the creditor's] secured position can only be enhanced by the continued operation of the [debtor's business]").

54.     Based on the adequate protection offered by Debtor, and the consents provided, the DIP Lender, the Mezzanine Lenders, and the Sellers have agreed to contractually subordinate the liens granted in respect of the Senior Loans and Junior Term Notes for the liens to be granted in the DIP Facility and has agreed that such pre-petition liens may be primed as described herein. The requirements of Section 364(d)(1)(B) have been fulfilled, and the proposed DIP Facility, including its priming provisions, should be approved.

## X.     FAR REACHING NEGATIVE EFFECT OF FAILURE TO OBTAIN APPROVAL USE OF CASH COLLATERAL

55.     DIP Lender has a pre-petition, senior, perfected security interest in and to all of Debtor's assets, as described above, and all of Debtor's Cash Collateral would be deemed cash collateral within the meaning of Section 363(a).

56.     Section 105(a) of the Bankruptcy Code provides that the Court may issue any order "necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a). SRC's use of Cash Collateral as permitted by this Motion is essential to its ability to successfully reorganize.

57.     Moreover, Section 363(c)(2) provides that a debtor may not use, sell or lease cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).

6004797.6

58.     One of SRC's pressing concerns is the need for immediate use of the Cash Collateral on an interim basis pending a final hearing.  Rule 4001(b) provides that a final hearing on a motion to use cash collateral pursuant to Section 363 may not be commenced earlier than 15 days after service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary hearing on the Motion and authorize the restricted use of Cash Collateral to the extent necessary to avoid immediate and irreparable damage to SRC's estate.  SRC requires the use of Cash Collateral to pay present operating expenses, including payroll, and to pay vendors to ensure a continued supply of goods and services essential to SRC's continued viability and commence immediate repairs of certain Cleveland Heavy Machinery in order to maintain operations.

59.     SRC's ordinary course operations generate Cash Collateral through the collection of accounts receivable.  Triangle asserts a security interest in SRC's Cash Collateral.

60.     SRC requires the use of Cash Collateral in order to meet its expenses and maintain the operation of its business and maintain supply to its customers for whom SRC is their sole supplier.  Without the use of Cash Collateral, SRC's operations will be substantially, immediately, and irreparably harmed as will its customers.  The continued operation of SRC's business is essential to its reorganization effort.

61.     In order to avoid immediate and irreparable harm to SRC's estate pending a final hearing on this Motion, SRC requires the interim use of Cash Collateral for a thirty (30) day period or through November 28, 2013, to pay, among other things, past-due and ongoing payroll, utilities, taxes, insurance, vendors, and other ordinary business costs and expenses and commence Cleveland Heavy Machinery repairs.

6004797.6

62.     The Cash Collateral proposed to be used by SRC consists of cash on hand and cash to be generated from the continued operation of the SRC's business and collection of accounts receivable and the DIP Facility.

63.     SRC believes and maintains that Pre-Petition Lender is adequately protected in any Cash Collateral that SRC may use as discussed above and Pre-Petition Lender has consented to such use in any event.  Similarly, and pursuant to Section 4.3, among other provisions, of the Seller-SRC Subordination and Triangle-SRC Subordinations., the Sellers consented to allow Debtor to use Cash Collateral under the terms and conditions demanded by the Pre-Petition Lender.

64.     SRC seeks to use Cash Collateral in accordance with its proposed Budget and thereafter upon further order of this Court, following a final hearing on this Motion, on a permanent basis, in accordance with its operating needs and the remediation required to the Cleveland Heavy Machinery.

65.     SRC needs immediate authority to use Cash Collateral to fund day-to-day operations.  In sum, the authorization to use Cash Collateral will preserve the going concern value of SRC.

66.     SRC maintains that use of Cash Collateral is absolutely essential for operations and, therefore, is in the best interest of its creditors and estates to authorize the use of Cash Collateral.

## XI.     NOTICE

67.     Notice of this Motion has been provided to (i) the office of the United States Trustee for Region IX; (ii) Debtor's secured lender (and proposed post-petition lender) Triangle Capital Corporation and its counsel, Gus Kallergis of Calfee, Halter & Griswold LLP; (iii) Triangle Mezzanine Fund, LLLP, Attn: Cary B. Nordan, and its counsel, Gus Kallergis of

6004797.6

Calfee, Halter & Griswold LLP; (iv) SRC Equity LLC and all other equity holders; (v) the additional creditors identified on the Debtor's list of twenty (20) largest unsecured creditors; (vi) Rossborough Supply Company and Magnesium Aluminum Corporation, c/o Monomoy Capital Partners, L.P., Attn: Justin Hillenbrand, and its counsel David A. Agay, McDonald Hopkins, 300 N. LaSalle Street, Suite 2100, Chicago, Illinois 60654; (vii) other known claimants having liens or security interests in property of Debtor; (viii) Debtor's depository bank, Bridge Bank, N.A.; (ix) any parties who provide Debtor with utility services; (xi) the Internal Revenue Service; (xii) the Office of the United States Attorney; (xiii) the United States Department of Justice; (xiv) the Ohio Environmental Protection Agency; (xv) the Cleveland Fire Department; and (xvi) Cleveland Department of Public Health, Division of Air Quality. In light of the nature of the relief requested, Debtor submits that no other or further notice is necessary.

Dated: October 28, 2013                     Respectfully submitted by:

                                            */s/ Christopher W. Peer*
                                            Nancy A. Valentine (0069503)
                                            Christopher W. Peer (0076257)
                                            Emily W. Ladky (0085527)
                                            Hahn Loeser & Parks LLP
                                            200 Public Square, Suite 2800
                                            Cleveland, Ohio 44114
                                            Telephone:    (216) 621-0150
                                            Facsimile:    (216) 241-2824
                                            E-Mail:       navalentine@hahnlaw.com
                                                          cpeer@hahnlaw.com
                                                          eladky@hahnlaw.com

                                            *Proposed Counsel for Debtor and Debtor-in-Possession*

6004797.6