# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF OHIO

```
-------------------------------------------------- x
In re:                                             :   Chapter 11
                                                   :
BUCKINGHAM SRC, INC.,                              :   Case No. 13-17583
                                                   :
                           Debtor.                 :   Judge Jessica E. Price-Smith
                                                   :
-------------------------------------------------- x
```

## MOTION FOR ENTRY OF ORDERS (A) APPROVING BIDDING PROCEDURES AND BIDDER PROTECTIONS FOR STALKING-HORSE BIDDER; (B) APPROVING FORM AND MANNER OF NOTICE OF AUCTION AND SALE; (C) APPROVING THE CREDIT BID RIGHTS OF TRIANGLE CAPITAL CORPORATION (D) APPROVING FORM AND MANNER OF NOTICE OF ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (E) APPROVING SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS; AND (F) GRANTING RELATED RELIEF

Buckingham SRC, Inc. ("SRC" or "Debtor")[1], debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Case"), by and through its proposed undersigned counsel, and as set forth more fully below, respectfully moves this Court for the entry of two orders. *First*, the entry of a proposed Sale Procedures Order, thereby (a) approving proposed Bidding Procedures and a Break-Up Fee for SRC's proposed Stalking-Horse Bidder for the sale of all Purchased Assets (consisting of substantially all of SRC's assets); (b) approving the proposed form and manner of notice of the Auction and Sale; (c) approving the credit bid rights of Triangle Capital Corporation; (d) approving the proposed form and manner of notice of proposed assumption and assignment of certain executory contracts and unexpired leases; and (e) granting related relief. *Second*, the entry of a proposed Sale Order, thereby (x) approving the sale of substantially all of the Purchased Assets to the Successful Bidder at the Auction; (y) approving

---

[1] Unless otherwise stated herein, capitalized terms not defined in this introductory paragraph are subsequently defined herein.

6020852.1
6037011.2

the assumption and assignment of executory contracts and unexpired leases; and (z) granting related relief. In support of this motion, SRC respectfully states as follows:

## BACKGROUND FACTS

1. On October 28, 2013 (the "Petition Date"), Debtor commenced the Case by filing its voluntary petition for relief under chapter 11 of the Bankruptcy Code.

2. Debtor is continuing in possession of its properties and assets and is operating and managing its business as debtor-in-possession pursuant to Sections 1107 and 1108. No trustee, examiner, or official committee of unsecured creditors has been appointed in the Case.

### *Debtor and Debtor's Business*

3. SRC's business produces both fused and blended magnesium flux for use in industrial and other applications. SRC also produces low moisture anhydrous magnesium chloride which is used by other of Debtor's customers in the plastics industry. SRC's fused fluxes are developed through processes that produce premium fluxes for control and refining of molten metal, primarily magnesium. SRC's fused fluxes are especially low in moisture, promoting safety and overall product quality, and offer higher value due to homogeneous chemistry and quality materials. SRC's blended fluxes provide added scope for the chemistry often required by customers but unavailable in a fused flux.

4. SRC is a leading producer of magnesium flux and has operated and produced magnesium flux for more than 35 years. SRC is one of the only producers of magnesium flux in the world and to SRC's knowledge the primary (if not only) source for flux located in the United States. SRC's customers bridge many industries, including, but not limited to, aerospace and

6037011.2

defense, agriculture, automotive, building and construction, consumer products, food and beverage, packaging and plastics.

5.　SRC employs 17 workers collectively at its Cleveland, Ohio and Albany, Oregon locations. These employees work to produce flux to customer specifications across the United States and around the world. SRC has built a reputation of success and quality in this specialized manufacturing process. SRC's competitive advantages flow from its experience and craft with this highly technical chemistry and the applications that can and do result from such use.

6.　As a result of its reputation and relationships, and the unique nature of the products SRC produces, SRC continues to have constant demand for SRC's products from its customers despite the need to commence this Case. In fact, the restructuring expected from this Case is anticipated to allow SRC to better meet this demand and restore profitability because SRC will receive funding to complete critical repairs and replacement of SRC's capital assets and restructure its capital structure.

### *Debtor SRC*

7.　SRC is a Delaware corporation headquartered in Cleveland, Ohio. Its mailing address is 3425 Service Road, Cleveland, Ohio. SRC is approximately 95% owned by SRC Equity, LLC ("SRC Equity") and the remainder is owned by related investors and SRC management.

### *Events Leading to the Chapter 11 Filing*

8.　SRC is a leader in the production, supply and distribution of magnesium fluxes (fused and blended) and low moisture anhydrous magnesium chloride.

9.　To complete production of products at the levels and volumes required by its customers, SRC owns and operates significant heavy machinery. This machinery includes (i) a scrubber system; (ii) a furnace; (iii) a mixer (with blending operations); (iv) cooling and packing

3

6037011.2

equipment; and (v) other equipment (collectively, the "Heavy Machinery"). The Heavy Machinery at SRC's Cleveland, Ohio location (the "Cleveland Heavy Machinery") is aged and in dire need of repair, and in some cases replacement.

10.     In May 2013, electrical failures befell SRC in Cleveland, which resulted in a significant decrease in the operations and output of the Cleveland Heavy Machinery. The decrease in output has resulted in a direct reduction in sales, despite continued demand. The economic result of the decrease in productivity and sales has been devastating. The year over year (through August 31 of 2012 and 2013) change in operating profit showed a decrease in profit of almost $450,000.00 (from $576,000.00 at 8/31/12 to $132,000.00 at 8/31/13). This change in financial stability has made it impossible for SRC to meet its financial obligations as such obligations came due, and forced SRC to fall chronically behind on payments to lenders and trade vendors. The decrease in sales negatively impacts SRC's working capital availability and cash flow and its ability to meet the demands of its customers.

11.     Moreover, the impairment of the Cleveland Heavy Machinery has led to safety and environmental concerns and inquiries from the Cleveland Department of Health, Division of Air Quality, the Cleveland Fire Department and the Ohio Environmental Protection Agency. SRC is diligently working to respond to these inquiries to ensure a safe and appropriate workplace. To date, concerns relating to reporting procedures have been the primary investigation.

12.     The repair and replacement of the Cleveland Heavy Machinery is essential to maintain operations and meet customer demand and, in part, to resolve concerns of the various regulatory agencies. SRC estimates that approximately $1 million in repairs and replacement

6037011.2

machinery are required to fix the Cleveland Heavy Machinery and return the Debtor to profitability.

13. As of October 27, 2013, SRC reported on its financial statements current "hard" assets of approximately $2,996,000.00 with cash of $43,968.00.

14. As of October 23, 2013, Debtor[2] owes Triangle Capital Corporation ("Triangle")[3] (i) the outstanding amount of not less than $376,903.64 on account of a certain revolving line of credit (the "Revolving Line of Credit"); and (ii) the outstanding amount of not less than $1,911,914.58 on account of that certain Term Loan (the "Senior Term Loan," and together with the Revolving Line of Credit, the "Senior Loans").

15. In addition, as of October 23, 2013, Debtor owes Triangle, and Triangle, as assignee of Triangle Mezzanine Fund LLP ("Triangle Mezzanine"), the outstanding amount of not less than $6,169,372.93 on account of certain junior term loans (the "Junior Term Loans").

16. First priority liens and security interests in substantially all the personal property assets of Debtor and a first priority mortgage interest in substantially all the real property of Debtor secures repayment of the Senior Loans. Second priority liens and security interests in substantially all of the personal property assets of Debtor and a second priority mortgage interest in substantially all of the real property of the Debtor secures repayment of the Junior Term Loans.

17. As of the October 27, 2013, SRC allegedly owes to Rossborough Supply Company and Magnesium Aluminum Corporation (collectively the "Sellers") the aggregate sum of $2,138,042.00 (the "Sellers Notes").

---

[2] Both Debtor and SRC Equity are obligated on the Triangle Secured Loans.
[3] On or about October 5, 2013 Triangle purchased both the Revolving Line of Credit and Senior Term Loan from Bridge Bank, National Association.

6037011.2

18.     The Sellers Notes are secured by a third priority security interest in certain personal property assets of Debtor. The Sellers have no lien or security interest in the real property of the Debtor. All interests of the Sellers in property of the Debtor, among other rights, are fully subordinated to the rights of Triangle under the Senior Loans and the Junior Term Notes. With its debt load, Debtor has negative net worth.

19.     The Senior Loans, Junior Term Loans, and the Sellers Notes mature in 2014. With the current state of the Cleveland Heavy Machinery and SRC's present inability to meet the demand of its customers, the Debtor projects that payment of these secured obligations will be impossible to meet. Moreover, as each month passes without remediation of the Cleveland Heavy Machinery, profitability falls.

20.     Also, as of the Petition Date, Debtor's financial statements report trade payables of approximately $718,316.00, which include substantial amounts owed to SRC's sole and critical United States supplier of the raw material to make magnesium fluxes.

21.     Debtor's senior secured lender, Triangle, has agreed to provide financing to Debtor through Debtor-in-Possession financing ("DIP Financing") to allow SRC to fix and replace certain Cleveland Heavy Machinery and maintain operations during repairs and this Case. Debtor's cash and repair needs are critical. Failure to repair and replace the Cleveland Heavy Machinery will result in Debtor's perpetual failure to meet customer demand and ultimately liquidation of Debtor. With overflowing orders in hand, financing provided by Triangle, and proper repair and replacement of the Cleveland Heavy Machinery, Debtor can get back on its feet, generate positive cash flow and restructure as a healthy and profitable business following a sale. As a condition to providing the DIP Financing, Debtor is required to pursue a sale of substantially all of its assets pursuant to Section 363 of the Bankruptcy Code.

6037011.2

### Sale and Marketing Efforts

22.    Until immediately before the Petition Date, Debtor made every effort to rehabilitate its finances independently, without assistance or need to pursue a sale of its assets. However, as a condition of the DIP Financing, Triangle has required that substantially all of the Debtor's assets be marketed for sale pursuant to section 363 of the Bankruptcy Code.

23.    Accordingly, on October 25, 2013, Debtor engaged the investment banking firm of MelCap Partners, LLC ("MelCap") to assist Debtor in marketing its assets and securing and closing a sale resulting from that marketing effort. Although that marketing process has just begun, based on (i) the robust customer base enjoyed by Debtor, and (ii) the strong Stalking Horse Bid submitted by Triangle, MelCap and Debtor hope for robust bidding.

### SRC's Stalking-Horse Bidder

24.    On October 25, 2013, Debtor and Triangle (together with any successors, designees, or assigns, the "Stalking-Horse Bidder")[4] entered into a term sheet (the "Asset Purchase Term Sheet"), pursuant to which the Stalking-Horse Bidder agreed to serve as the stalking-horse bidder for the purchase of substantially all of Debtor's assets. Resulting from this Asset Purchase Term Sheet, Debtor and Stalking Horse Bidder entered into an Asset Purchase Agreement (the "Stalking-Horse APA"), pursuant to which the Stalking-Horse Bidder agreed to purchase, and Debtor agreed to sell, Purchased Assets[5] consisting of substantially all of Debtor's assets. The Stalking Horse APA and Asset Purchase Term Sheet provide that Triangle shall make a credit bid of the aggregate sum of (a) the entire amount SRC owes Stalking Horse Bidder

---

[4] For avoidance of doubt, and in an effort to provide full disclosure, in addition to being SRC's senior lender, Triangle has agreed to provide the DIP Financing, and is using its credit bid rights to serve as the Stalking Horse Bidder.

[5] As defined in the Stalking-Horse Bidder APA. Unless otherwise defined or stated herein, all capitalized terms used this section of the Motion shall have the meanings ascribed to them in the Stalking-Horse APA. Nothing contained herein is or shall be deemed to be an amendment, supplement, or other modification of the Stalking-Horse APA.

6037011.2

pursuant to its pre-petition loans as of the date such sale is consummated; plus (b) all amounts SRC owes Stalking Horse Bidder pursuant to the DIP Financing as of such date such sale is consummated; such aggregate amount is expected to exceed the $8,458,191.15 due to Stalking Horse Bidder on the Petition Date, representing a significant portion of the debt owed to it by the Debtor (the "Purchase Price"). Moreover, Stalking Horse Bidder, in the Stalking Horse APA, has committed to assume significant pre-petition liabilities (the "Assumed Liabilities"), providing increased value to the Stalking Horse Bidder's bid. Stalking Horse Bidder has agreed to notify all interested parties of the anticipated dollar amount of the Purchase Price (including per diem for amounts following December 4, 2013 and additional amounts anticipated to be provided pursuant to the DIP Financing after December 4, 2013 but prior to the Auction) as of December 4, 2013 no later than five (5) days prior to the date set to submit bids (the "Bid Deadline") (proposed to be December 9, 2013), or December 4, 2013 and Debtor agrees to provide email notice of such set amount for the Purchase Price to all parties that have expressed an interest in purchasing the Assets, the United States Trustee for Region IX and any Committee(s) which may be formed in this Case. For avoidance of doubt, the Purchase Price is not intended and shall not limit Triangle's ability to make a credit bid with any and all remainder of its debt owed from the Debtor (pre and post-petition). In exchange for the Stalking-Horse Bidder's willingness to serve in such capacity, the Stalking-Horse APA also calls for (i) a break-up fee in the amount of $250,000.00 (the "Break-Up Fee"); and (ii) an expense reimbursement of up to $200,000.00 to reimburse the Stalking Horse Bidder's actual sale-related expenses (the "Expense Reimbursement" and together with the Break-Up Fee, the "Bidder Protections") to be paid to the Stalking-Horse Bidder in the event that it is outbid at the Auction. The transactions contemplated by the APA are subject, among other things, to this Court's approval.

6037011.2

25.     Notwithstanding Debtor's selection of the Stalking-Horse Bidder and execution of the Stalking-Horse APA, Debtor, with the assistance of MelCap is marketing the Purchased Assets aggressively in order to ensure the Purchase Price is tested through market forces and auction. Debtor has requested that this Court authorize the retention of MelCap as investment banker, primarily on a "transaction value" fee basis, to continue to provide assistance in the marketing and sale of the Purchased Assets and to ensure that MelCap is properly incentivized. A true and correct copy of the Stalking-Horse APA is attached to the proposed Bidding Procedures (as defined below) as Exhibit A.

### *Justification of the Sale Process*

26.     It is necessary to pursue a sale in order to guard against the erosion of Debtor's collateral base, demonstrate to SRC's customers that SRC will continue to timely supply product, and preserve the going-concern value of SRC's business for all interested parties. Selling substantially all of SRC's assets is a condition to Triangle's agreement to continue to provide funding. Without this funding, and the repairs and new equipment it makes available, Debtor's business will continue to atrophy without realistic opportunity to regain profitability. Unless SRC sells its business as a going concern, it is likely that SRC's business may have to shut down altogether. A sale to the Stalking-Horse Bidder (or the ultimate successful bidder at the auction), which is able to invest working capital, can preserve the value of the assets, restore certainty to customers, potentially preserve the jobs of many, if not all, employees, and will maintain the continuity of operations for the benefit of many parties, including customers and creditors.

27.     Due to the faulty condition of the Cleveland Heavy Machinery, time is of the essence to complete restructuring and commence and complete a sale process. Speed is important so that the Stalking Horse Bidder (or another bidder submitting a higher and better

9

bid) can do what is necessary to heal and repair customer relationships desperately in need of attention with the aid of a restructured balance sheet and restored Heavy Machinery. Moreover, SRC believes that the offer made by the Stalking Horse Bidder represents a premium and the process should reflect the premium being paid to maximize the opportunity for the Stalking Horse Bidder (or any other bidder submitting a higher and better bid). SRC's customers have been very loyal, but repeated delays in the delivery of products and goods have eroded a once-solid customer-producer relationship. Each day that passes without reliability from SRC and knowledge of who will operate SRC's assets going forward adds to the risks and decreases the value that can be generated from the Sale.

## RELIEF REQUESTED

### *Request for Entry of Sale Procedures Order*

28.     Debtor respectfully requests the entry of an order, substantially in the form of the proposed order attached hereto as Exhibit A (the "Sale Procedures Order") (a) approving the Stalking-Horse APA; (b) approving the Bidder Protections; (c) approving the credit bid of the Stalking Horse Bidder; (d) scheduling an auction of the Purchased Assets to be held on **December 13, 2013, at 10:00 a.m. E.T.** (as the same may be rescheduled or adjourned from time to time, the "Auction"); (e) approving the proposed bid procedures attached to the Sale Procedures Order as Exhibit 1 (the "Bidding Procedures") for use at the Auction; (f) scheduling a final hearing on the sale of the Purchased Assets (the "Sale") to the successful bidder at the Auction (the "Successful Bidder") to be held on **December ___, 2013, at _____. E.T. (during the week of December 16, 2013 as the Court's calendar allows)** or as soon thereafter as Debtor may be heard (the "Sale Hearing"); (g) approving the proposed form of notice of the Sale Hearing, attached to the Sale Procedures Order as Exhibit 2 (the "Sale Notice"); (h) approving the form and manner of service of notice of the potential assumption and assignment

10

6037011.2

of certain contracts and leases (collectively, the "Contracts"), attached to the Sale Procedures Order as Exhibit 3 (the "Cure Claim Notice"); (i) waiving the memorandum of law requirements of Local Bankruptcy Rule 9013-1(a); and (j) granting such other and further relief to which SRC is justly entitled.

### *Request for Entry of Sale Order*

29.     Subsequent to the entry of the Sale Procedures Order, Debtor respectfully requests the entry of an order (the "Sale Order") (a) approving the sale of the Purchased Assets free and clear of any and all liens, claims, interests, and encumbrances to the Successful Bidder at the Auction; (b) approving the assumption and assignment of certain identified executory contracts and unexpired leases; (c) waiving the 14-day stays of Bankruptcy Rules 6004(h) and 6006(d); (d) waiving the memorandum of law requirements of Local Bankruptcy Rule 9013-1(a); and (e) granting such other and further relief to which Debtor is justly entitled.

30.     Debtor believes that the transactions contemplated pursuant to this motion are in the best interests of Debtor's bankruptcy estate and are in the best interests of all creditors and other interested parties in the Case. As set forth more fully below, an orderly, going-concern sale of the Purchased Assets is essential, time is of the essence, and will result in greater value to Debtor's estate than any piecemeal liquidation ever could.

### SALE PROCEDURES AND RELATED RELIEF

### *Stalking-Horse Bidder, Stalking-Horse APA, Bidding Procedures, Credit Bid Rights, Auction, and Sale Hearing*

31.     Section 363 governs a debtor's ability to sell property of the estate outside the ordinary course of business. 11 U.S.C. §363. In determining whether to authorize such use, sale or lease of property under Section 363, a debtor must show that a sound business purpose justifies such actions. The United States Court of Appeals for the Sixth Circuit concluded that "a

6037011.2

bankruptcy court can authorize a sale of all a Chapter 11 debtor's assets under §363(b)(1) when a sound business purpose dictates such action" and prior to confirmation of a plan of reorganization. *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 389-90 (6th Cir. 1986). *See also Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983).

32.      Applying Section 363, the courts have generally given a debtor substantial deference in formulating procedures for selling assets. *See, e.g., Official Committee of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 656-57 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49, 54 (2d Cir. 1993) (noting that overbid procedures and break-up fee arrangements that have been negotiated by a debtor-in-possession are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"). Indeed, courts recognized that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and are appropriate in the context of bankruptcy sales. *See, e.g., Integrated Res.*, 147 B.R. at 659-60 (such procedures should "encourage bidding and . . . maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and . . . provide for a fair and efficient resolution of bankrupt estates").

33.      Subject to Court approval, SRC selected the Stalking-Horse Bidder pursuant to the terms in the Stalking-Horse APA. SRC selected the Stalking-Horse Bidder, among other reasons, because (i) the Purchase Price was the greatest offered and significantly more than the expected value of the combination of its hard and working capital assets; (ii) Stalking-Horse

6037011.2

Bidder's strength demonstrated by the premium they are proposing to pay for the Purchased Assets; and (iii) the Stalking-Horse Bidder's ability to close a transaction without any financing contingencies. Moreover, the Stalking Horse Bidder provides stability to SRC's operations and customers (through the DIP Facility and knowledge that SRC will continue to exist post-sale). Further, given the Purchase Price (and the likelihood of it increasing), the Break-Up Fee and Expense Reimbursement (which are static) are reasonable and customary under the circumstances. Accordingly, SRC submits that the Stalking-Horse APA should be approved for use by other potential purchasers pursuant to the Bidding Procedures, and the Bidder Protections should be approved for payment in the event that the Stalking-Horse Bidder does not acquire the Purchased Assets.

34.     In the instant case, the Bidding Procedures also are supported by ample business justification and are reasonable and appropriate under the circumstances of the Case. The proposed Bidding Procedures are designed to foster an open, competitive, and fair sale process, thereby maximizing the value to SRC's estate while preserving opportunity for SRC, SRC's customers, creditors, vendors and employees. SRC respectfully requests the Bidding Procedures be approved as fair and reasonable under the circumstances, and that SRC be authorized to conduct the Auction as provided therein.

35.     SRC contemplates requiring all bids be submitted to SRC's professionals no later than 5:00 pm. E.T on December 9, 2013, who will in turn provide copies of such bids (in each event, a "Bid") to counsel for any Committee that is formed in this Case.[6]

36.     In order for a party submitting a Bid to be a "Qualified Bidder", SRC expects, in addition to the terms and conditions in the Bidding Procedures, that such bidders shall:

---

[6] Although it is customary for the senior lender to review Bids and participate in discussions to determine the highest and best bids, Stalking Horse Bidder realizes that such participation could present the appearance of impropriety, and has voluntarily agreed to forego this customary right and relief.

6037011.2

(a)    Submit a Bid of no less than $300,000 more than the Purchase Price (as set five days prior to the Bid Deadline (as defined herein);

(b)    Submit a Bid that contains no financing or due diligence contingencies;

(c)    Submit a Bid that provides for the deposit of at least 5% of the value of their Bid (the "Deposit")

(d)    Actually make a deposit in cash (or by providing an irrevocable letter of credit) in the amount of the Deposit in escrow with Debtor's counsel, to be held to secure such party's Bid in the event such bidder presents the highest and best bid (the "Successful Bidder") or the second highest and best bid (the "Second Bidder");

(e)    Submit with the Bid documentation, in the form of financial statements, or other documentation acceptable to SRC, in its sole discretion, demonstrating that such bidder is able to complete the transaction contemplated therein; and

(f)    Submit a Bid using the Stalking Horse APA as it baseline, submitting its proposed Asset Purchase Agreement in clean and compared forms to the Stalking Horse APA.

37.    SRC contemplates holding the Auction at the Cleveland, Ohio offices of their counsel, Hahn Loeser & Parks LLP, located at 200 Public Square, Suite 2800, Cleveland, Ohio 44114. SRC proposes to have the Auction commence at 10:00 a.m. E.T. on December 13, 2013. SRC reserves the right to postpone or reschedule the Auction.[7]

38.    SRC respectfully requests that the Court schedule the Sale Hearing, to consider approval of the Sale to any Successful Bidder, and the assumption and assignment of certain unexpired leases and executory contracts and related relief, to be held on a date during the week of **December 16, 2013.** SRC reserves the right to request adjournment of the Sale Hearing to a later date if SRC believes it is in the best interest of the estate.

---

[7] Further details regarding the Auction and the Bidding Procedures in general are included in the Bidding Procedures. Nothing contained herein modifies or shall be deemed to modify the proposed Bidding Procedures.

6037011.2

*Stalking Horse Bidder Should Be Approved To Use Its Credit Bid Rights*

39.     Section 363(k) of the Bankruptcy Code plainly states that when property is sold other than in the ordinary course of business of the debtor, any party who claims a valid lien may offset such claim against the purchase price of the property.  11 U.S.C. § 363(k).  This provision is commonly referred to 'credit bidding" and gives rise to the right of a senior lender to bid in its debt at a sale.

40.     In the instant case it is beyond dispute that the Stalking Horse Bidder has a first position priority security  interest in substantially all assets of the Debtor, exactly the assets proposed to be sold by this Motion.  Stalking Horse Bidder is owed in excess of $8 million on the Petition date on account of the Senior Loans and the Junior Term Loans.  Moreover, Stalking Horse Bidder provided the DIP Facility, adding to its senior debt.

41.     Pursuant to the Stalking Horse APA, Stalking Horse Bidder is proposing to bid in all of its debt for its Stalking Horse Bid.  This offer is material and real.  There is no question that the Stalking Horse Bidder's Bid is valid or that the Stalking Horse Bidder will be able to close a transaction to complete the Sale.

42.     The approach of a stalking horse bidder submitting its bid via credit bid is not novel.  In fact, case law identifies numerous situations in which a credit bidding party served as stalking horse bidder to set the stage for a sale process under Section 363.  *See e.g., In re Blixeth*, 2011 Bankr;. LEXIS 1451 (Bankr. D. Mont. April 20, 2011) (acknowledging that a credit bid can provide the basis for a stalking horse bid); *Official Committee of Unsecured Creditors v. Terforum Holding, LLC,* 2011 U.S. Dist. LEXIS 73421 (E.D. Wisc., July 7, 2011) (approving 363(m) status for a credit bidding stalking horse).

43.     The ability of Stalking Horse Bidder to credit bid should be upheld, authorized and communicated to all interested parties.

15

6037011.2

## *Form and Manner of Service of Notice of the Sale*

44.     SRC proposes to give notice of the Sale, the Sale Procedures Order, the Auction and the Sale Hearing in the form and manner as set forth in the proposed Sale Notice, which is attached to the Sale Procedures Order as <u>Exhibit 2</u>.  As set forth in the proposed Sale Notice, persons desiring to object to the Sale must file with the Court and serve upon SRC's counsel an objection no later than **two (2) days prior to the date set by the Court for the Sale Hearing.** If timely objections are received, SRC proposes that the Court hear the objections at the Sale Hearing.

## *Form and Manner of Service of Notice of Assumption and Assignment of Unexpired Leases and Executory Contracts*

45.     SRC proposes to file and serve upon all parties to the Contracts that are or may be assumed and assigned in connection with the Sale a Cure Claim Notice, the proposed form of which is attached to the Sale Procedures Order as <u>Exhibit 3</u>, within one business day after the day on which the Sale Procedures Order is entered.  SRC reserves the right to modify the Cure Claim Notice as necessary and applicable.  The schedule attached to the Cure Claim Notice shall include SRC's calculation of the amount it believes must be paid to cure any default under each such Contract (the "<u>Cure Amounts</u>").  SRC reserves the right to amend and modify the Cure Amounts as necessary and applicable.  Unless the non-debtor party to such Contract files with the Court and serves upon SRC an objection to its scheduled Cure Amount or the assumption and assignment of their Contract(s) on or before **two (2) days prior to the date set by the Court for the Sale Hearing**, such party shall be forever barred from objecting to the Cure Amount or the assumption and assignment of a Contract, and from asserting any additional cure or other amounts with respect to such Contract.  If an objection to a scheduled Cure Amount or the

6037011.2

assumption and assignment of a Contract is filed in accordance with the Cure Claim Notice, then SRC proposes that the Court hear that objection at the Sale Hearing.

46. SRC submits that the notices proposed with respect to the Sale and assumption and assignment of executory contracts and unexpired leases are reasonably calculated to provide timely and adequate notice to SRC's creditors and parties-in-interest, and those parties interested in bidding on the Purchased Assets. Accordingly, SRC submits that such notices constitute good and sufficient notice under the circumstances and that no further notice need be given.

## SALE APPROVAL AND RELATED RELIEF

### *Approval of Sale of Purchased Assets*

47. "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). In determining whether to authorize such use, sale, or lease of property outside the ordinary course of business and outside of any chapter 11 plan pursuant to Section 363(b), SRC must show that a sound business purpose justifies such actions. *Stephens Indus., Inc. v. McClung,* 789 F.2d at 389-90; *see also In re Lionel Corp.* 722 F.2d at 1070. The issue directly before the *Lionel* court was "to what extent chapter 11 permits a bankruptcy judge to authorize the sale of an important asset of the bankrupt's estate, out of the ordinary course of business and prior to acceptance and outside of any plan of reorganization." *In re Lionel Corp.*, 722 F.2d at 1066.

48. The *Lionel* test requires a debtor to establish, as a threshold matter, a "sound business reason" justifying the pre-confirmation sale of assets. The *Lionel* court held that, when addressing a motion pursuant to Section 363(b), a bankruptcy judge should consider all salient factors and the business justifications for a debtor to sell assets pursuant to Section 363(b). *Id.* at 1071.

6037011.2

49.     In order to demonstrate a sound business purpose warranting a sale, courts within the Sixth Circuit and in other jurisdictions have developed a four-part test requiring a debtor to demonstrate: "1) sound business reason; 2) accurate and reasonable notice; 3) adequate price; and 4) good faith." *In re Country Manor of Kenton, Inc.*, 172 B.R. 217, 220-21 (Bankr. N.D. Ohio 1994) (citations omitted).     All factors weigh in favor of approving the sale of the Purchased Assets.

50.     There is a sound business justification for approving the Sale. SRC does not presently have requisite funding, nor are any lenders willing to provide the requisite funding, to invest in SRC's Heavy Machinery, absent completion of the Sale process described in this Motion. SRC's ability to use funding and cash collateral to conduct on-going operations also is contingent upon, among other things, pursuing an expedited sale of its assets pursuant to Section 363. Accordingly, SRC has determined that a Sale pursuant to Section 363 to a purchaser with adequate resources to invest in the Heavy Machinery will maximize the value of SRC's estate for the benefit of its creditors, customers, and employees. Conversely, a liquidation would have a materially adverse impact upon SRC, its estate, employees, customers, and creditors. Beyond the foregoing, and perhaps most importantly, a Sale may be the only alternative to protect the jobs of its many employees and the customers that contracted with SRC for product. As a result, a Sale is justified. *See In re Trans World Airlines, Inc.,* 322 F.3d 283, 293 (3d Cir. 2003) (affirming the bankruptcy court's sale of substantially all of the debtor's assets, considering the strong likelihood of piecemeal liquidation should the sale not occur).

51.     There has been adequate and reasonable notice of the Sale. This Motion was filed on October 31, 2013, with a proposed Sale Hearing to be held during the week of December 16, 2013. MelCap has and will continue to market the Purchased Assets during the period preceding

a hearing on this Motion. Moreover, the proposed Sale Procedures Order ensures that creditors and interested parties are afforded ample notice and opportunity to object to the Sale and related transactions.

52.     The Purchased Assets are being sold for an adequate price. The Stalking Horse Bidder's Bid (as compared to the Debtor's own records) shows that the Stalking Horse Bidder is agreeing to pay a premium for the Purchased Assets – thus more than adequate.    As demonstrated above, SRC, with the assistance of MelCap, is aggressively marketing the Purchased Assets.  MelCap is already identifying and talking to potential bidders who are interested in acquiring a business with such a strong customer base, attracting the interest of as many potential purchasers as possible. Further, the Auction and Bidding Procedures will ensure that the proposed purchase price is tested competitively, and will result in the highest and best possible sale price for the estate, creditors, and all interested parties.

53.     Finally, SRC negotiated the contemplated Sale transaction at arm's length, without collusion, and in good faith within the meaning of Section 363(m). SRC required many changes to the Stalking Horse APA and the Bidding Procedures to ensure a fair sale and transaction process. Notably, Triangle, as senior secured lender, has agreed, after negotiation with SRC, to not be a party receiving copies of the Bids or consulted in the decision of which Bid is highest and best, even though it would be customary for the senior secured lender to be involved in such process.    SRC requests that the Court determine that the entire Sale process was conducted in good faith within the meaning of Section 363(m) and that SRC and any Successful Bidder are entitled to the protections of Section 363(m). *See, e.g., In re Apex Oil Co.,* 92 B.R. 847, 873-74 (Bankr. E.D. Mo. 1988).

54.     Based upon the foregoing, SRC submits that a sale of the Purchased Assets represents a sound exercise of SRC's business judgment, is in the best interest of SRC's estate, and should be approved in all respects.

### The Sale of Purchased Assets Should be Free and Clear of Any and All Liens, Claims, Interests, and Encumbrances

55.     A debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims, interests and encumbrances in such property if,

> a)  applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> b)  such entity consents;
>
> c)  such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> d)  such interest is in bona fide dispute; or
>
> e)  such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

56.     The contemplated Sale satisfies the requirements of Section 363(f).  First and foremost, Triangle (who is the only party believed to have an interest "in the money") consents to the Sale. 11 U.S.C. § 363(f)(2). Notwithstanding Triangle's consent, all parties may be compelled to accept money in satisfaction of their interests in the Purchased Assets, 11 U.S.C. § 363(f)(5).

### Assumption and Assignment of Executory Contracts and Unexpired Leases

57.     Pursuant to Sections 365(a), (b) and (f), but conditioned on the closing of the Sale, SRC requests entry of an order approving the assumption by SRC and the assignment by SRC to any Successful Bidder of the Contracts.

6037011.2

58.     Section 365(a) provides:

> [e]xcept as provided in sections 765 and 766 of this title and in
> subsections (b), (c), and (d) of this section, the trustee, subject to
> the court's approval, may assume or reject any executory contract
> or unexpired lease of the debtor.

11 U.S.C. § 365(a).  This authority extends to debtors-in-possession, like SRC.  11 U.S.C. §
1107(a).

59.     A debtor's decision to assume or reject an unexpired lease or executory contract
must only satisfy the business judgment rule and will not be disturbed unless such decision is
clearly an unreasonable exercise of such judgment. *See Four B. Corp. v. Food Barn Stores, Inc.
(In re Food Barn Stores, Inc.),* 107 F.3d 558, 567 n. 16 (8th Cir. 1996). *See also Phar-Mor, Inc.
v. Strouss Bldg. Assocs.,* 204 B.R. 948, 952 (N.D. Ohio 1997); *In re Structurelite Plastics Corp.,*
86 B.R. 922, 925 n.4 (Bankr. S.D. Ohio 1988).

60.     Section 365(b)(1) requires a debtor-in-possession to satisfy certain requirements
at the time of assumption if a default exists under the contract to be assumed.  Section 365(b)(1)
provides:

> (b) (1)  [i]f there has been a default in an executory contract
> or unexpired lease of the debtor, the trustee may not assume such
> contract or lease unless, at the time of assumption of such contract
> or lease, the trustee –
>
> > (A)  cures, or provides adequate assurance that the
> > trustee will promptly cure, such default;
> >
> > (B)  compensates, or provides adequate assurance
> > that the trustee will promptly compensate, a party other
> > than the debtor to such contract or lease, for any actual
> > pecuniary loss to such party resulting from such default;
> > and
> >
> > (C)  provides  adequate  assurance  of  future
> > performance under such contract or lease.

11 U.S.C. § 365(b)(1).

6037011.2

61.     Prior to assignment of an executory contract, a debtor-in-possession must comply with Section 365(f)(2), which provides:

> (2)     [t]he trustee may assign an executory contract or unexpired lease of the debtor only if–
>
> (A)     the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)     adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 .S.C. § 365(f)(2).

62.     Debtor will seek the cure of any defaults under the Contracts at or before Closing, thereby satisfying Sections 365(b)(1)(A) and (B). In fact, the Stalking Horse Bidder has already agreed to this action in the Stalking Horse APA with respect to the Contracts. Adequate assurance of future performance depends upon the facts and circumstances of each case but should be given practical, pragmatic construction. *In re Tama Beef Packing, Inc.*, 277 B.R. 407, 411 (Bankr. N.D Iowa 2002) (citations omitted) (holding that "[i]n making the determination of 'adequate assurance,' the Court must give a practical pragmatic construction based on the circumstances of each case"). Evidence of adequate assurance of future performance can be established based upon the financial health and experience of the assignee in the type of enterprise and property involved. *In re Bygaph, Inc.,* 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986); *In re Alipat, Inc.*, 36 B.R. 274, 278 (Bankr. E.D. Mo. 1984) (holding that a business assigned to an experienced operator that will operate the business in substantially the same way will provide adequate assurance). Here, the Stalking-Horse Bidder is a financially sound, well known, financially-backed entity. Accordingly, Debtor submits that adequate assurance of future performance exists. SRC anticipates that the Qualified Bidders participating in the Auction will similarly be able to perform under any Contracts assumed and assigned pursuant to the Sale.

22

6037011.2

63.    As set forth in the proposed Sale Procedures Order, SRC proposes serving all parties to Contracts with the Cure Claim Notice (and, in fact, has already served this motion on such parties).  The Cure Claim Notice sets forth the proposed Cure Amounts and procedures for objecting to the assumption and assignment of Contracts.  At the Sale Hearing, SRC will establish, as previously addressed, adequate assurance of future performance under the Contracts.  The Court's findings at the Sale Hearing as to the Cure Amounts, if any, arising from the Contracts pursuant to Section 365(b)(1) should be final and binding on the parties to all Contracts, and should not be subject to further dispute or audit based on performance prior to the time of assumption and assignment (to the extent any Contract contains an audit clause), except as otherwise provided by the Sale Order.

64.    Section 365(k) further provides:

> [a]ssignment by the trustee to an entity of a contract or lease assumed under this section relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment.

11 U.S.C. § 365(k).

65.    Based upon the foregoing, SRC's assumption and assignment of the Contracts subject to the Sale complies with Section 365(k) and, thus, upon the approval of such assumption and assignment, and pursuant to Section 365(k), after payment of the Cure Amount, SRC should be relieved of all liability on the assumed and assigned Contracts.

### *Waiver of 14-Day Stays of Rules 6004(h) and 6006(d)*

66.    Unless the Court orders otherwise, all orders authorizing the sale of property pursuant to Section 363 and the assumption and assignment of executory contracts pursuant to Section 365 are automatically stayed for 14 days after entry.  Fed. R. Bankr. P. 6004(h) & 6006(d).  The purpose of Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting

6037011.2

party to request a stay pending appeal before the order can be implemented. *See* Advisory Committee Notes to Fed R. Bankr. P. 6004(h) and 6006(d).

67.     Although Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, *Collier on Bankruptcy* suggests that the 14-day period should be eliminated in order to allow the sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy 6004.09. Furthermore, *Collier on Bankruptcy* provides that if an objection is filed and overruled, and the objecting party informs the Court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal. *Id.*

68.     As previously set forth herein, time is of the essence with respect to the contemplated transaction, given the fact that SRC's right to borrow money under the DIP Financing will expire on January 15, 2014. As such, SRC has every expectation that it will choose to close this sale as soon as possible after all closing conditions have been met or waived. Accordingly, SRC respectfully requests that the Court waive the 14-day stay period under Rules 6004(h) and 6006(d) in this instance.

### REQUEST FOR WAIVER OF MEMORANDUM OF LAW REQUIREMENT

69.     Local Bankruptcy Rule 9013-1(a) requires each motion to be accompanied by a memorandum of law in support thereof. Because this motion does not request any novel relief, and because the legal authority forming the basis of the relief requested is set forth herein, SRC respectfully requests a waiver of the memorandum of law requirement insofar as it pertains to this motion only.

6037011.2

## NOTICE

1. Notice of this Motion has been provided to (i) the office of the United States Trustee for Region IX; (ii) Debtor's secured lender (and proposed post-petition lender) Triangle Capital Corporation, Attn: Cary B. Nordan, and its counsel, Gus Kallergis of Calfee, Halter & Griswold LLP; (iii) Triangle Mezzanine Fund, LLLP, Attn: Cary B. Nordan, and its counsel, Gus Kallergis of Calfee, Halter & Griswold LLP; (iv) SRC Equity LLC and all other equity holders; (v) the additional creditors identified on the Debtor's list of twenty (20) largest unsecured creditors; (vi) Rossborough Supply Company and Magnesium Aluminum Corporation, c/o Monomoy Capital Partners, L.P., Attn: Justin Hillenbrand, and its counsel David A. Agay, McDonald Hopkins, 300 N. LaSalle Street, Suite 2100, Chicago, Illinois 60654; (vii) other known claimants having liens or security interests in property of Debtor; (viii) Debtor's depository bank, Bridge Bank, N.A.; (ix) any parties who provide Debtor with utility services; (xi) the Internal Revenue Service; (xii) the Office of the United States Attorney; (xiii) the United States Department of Justice; (xiv) the Ohio Environmental Protection Agency; (xv) the Cleveland Fire Department; and (xvi) Cleveland Department of Public Health, Division of Air Quality. In light of the nature of the relief requested, Debtor submits that no other or further notice is necessary.

WHEREFORE, SRC respectfully requests the entry of two orders: first, the Sale Procedures Order (a) approving the Stalking-Horse APA; (b) approving the Bidder Protections; (c) approving the credit bid rights of Triangle; (d) scheduling an Auction; (e) approving the Bidding Procedures for use at the Auction; (f) scheduling the Sale Hearing in order to consider the Sale of the Purchased Assets to the Successful Bidder at the Auction; (g) approving the proposed Sale Notice; (h) approving the Cure Notice; (i) waiving the memorandum of law

6037011.2

requirements of Local Bankruptcy Rule 9013-1(a); and (j) granting such other and further relief to which SRC is justly entitled. Second, the Sale Order (a) approving the sale of the Purchased Assets free and clear of any and all liens, claims, interests, and encumbrances to the Successful Bidder at the Auction; (b) approving the assumption and assignment of certain executory contracts and unexpired leases; (c) waiving the 14-day stays of Bankruptcy Rules 6004(h) and 6006(d); (d) waiving the memorandum of law requirements of Local Bankruptcy Rule 9013-1(a); and (e) granting such other and further relief to which SRC is justly entitled.

Dated:  October 31, 2013                    Respectfully submitted by:

                                            */s/ Christopher W. Peer*
                                            Nancy A. Valentine (0069503)
                                            Christopher W. Peer (0076257)
                                            Emily W. Ladky (0085527)
                                            Hahn Loeser & Parks LLP
                                            200 Public Square, Suite 2800
                                            Cleveland, Ohio 44114
                                            Telephone:   (216) 621-0150
                                            Facsimile:   (216) 241-2824
                                            E-Mail:      navalentine@hahnlaw.com
                                                         cpeer@hahnlaw.com
                                                         eladky@hahnlaw.com

                                            *Proposed Counsel for Debtor and Debtor-in-Possession*

6037011.2